UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN ROSADO,

Plaintiff,

-against-

CHUNG LEE,

Defendant.

---

No. 23-CV-3718 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

In this matter, Dr. Chung Lee moves for summary judgment. (S.D.N.Y. 23-cv-3718, dkt. nos. 168 [Mot.], 172 [MOL]).  Plaintiff John Rosado opposes the motion. (23-cv-3718, dkt. no. 205 [Opp.].) Defendant has replied.  (23-cv-3718, dkt. no. 211 [Reply].)

I.   **Background**

**A. Factual Background**

The Court assumes familiarity with its decision in related case Allen v. Mueller, No. 23-CV-5651, 2024 WL 3090141 (S.D.N.Y. June 21, 2024).  A streamlined version of the relevant facts and procedural history follows.

The above-captioned case arises from a class action brought by several named New York State Department of Corrections and Community Supervision ("DOCCS") inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued after the institution of the Medications With Abuse Potential ("MWAP") Policy.  See Allen v. Koenigsmann, No. 19-CV-

1

8173, 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023).[1]  (See also Allen I, Plaintiff's Memorandum of Law in Support of Motion for Class Certification, dated May 19, 2022 ("Pl. Class Cert. Br.") [19-CV-8173, dkt. no. 371] at 21.)[2]

DOCCS adopted the MWAP Policy in June 2017.  (See Stewart v. Mueller, Defendant Mueller's Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 15, 2023 ("Mueller 56.1 Stmt.: Stewart) [23-CV-5668, dkt. no. 19] ¶ 3.)  The MWAP Policy required any DOCCS medical provider who sought to prescribe certain medications to submit an "MWAP Request" to the DOCCS Regional Medical Director ("RMD") in charge of the medical provider's facility.  (See id. ¶ 5.)  Before the DOCCS medical provider had authority to prescribe the requested medication for long-term use for chronic conditions, the RMD had to approve the MWAP Request. (See id.)

The stated purpose of the MWAP Policy was to control the prescriptions of medications that DOCCS believed might carry the risk of abuse or dependence by DOCCS inmates.  (See Rivera-Cruz v. Mueller, Declaration of A.J. Agnew in Opposition to Motion for

---

[1] The Court will refer to the class action, 19-CV-8173, as **"Allen I."**

[2] Unless otherwise noted, page numbers cited herein reflect ECF page numbers, rather than page numbers of the parties' submissions. The Court will also cite page numbers using the various methods of pagination used by the parties in their exhibits (such as MD 000406); in such instances the Court will add an asterisk "*" before the pagination.

Summary Judgment, dated December 27, 2023 ("Rivera-Cruz, Agnew Decl.") [23-CV-5657, dkt. no. 29], Ex. 23 [23-CV-5667, dkt. no. 29-25] at 2.) Medications that required RMD approval under the MWAP Policy included Gabapentin (Neurontin), Lyrica (Pregabalin), Baclofen, Flexeril (Cyclobenzaprine), Ultram (Tramadol), Percocet, and Oxycodone. (See Mueller 56.1 Stmt.: Stewart ¶ 6.) DOCCS rescinded the MWAP Policy on February 8, 2021. (See State Represented Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 16, 2023 ("SRD 56.1 Stmt.: Gradia") [23-CV-5660, dkt. no. 24] ¶ 6.)

Plaintiffs in the class action asserted claims under 42 U.S.C. § 1983 alleging deliberate indifference to their medical needs due to DOCCS' implementation of the MWAP Policy and the discontinuation and denial of their medications that ensued. (Allen I, Second Amended Complaint, dated December 12, 2020 [19-CV-8173, dkt. no. 256] at 137-40.) Plaintiffs moved for class certification and for a preliminary injunction seeking relief from the ongoing effects of the MWAP Policy, arguing that DOCCS was continuing to deny effective treatment to patients who had lost their medications due to the MWAP Policy. (Allen I, Pl. Class Cert. Br. at 21-22; Allen I, Plaintiff and Plaintiff-Intervenors' Memorandum of Law in Support of Motion for Injunctions, dated May 31, 2022 [19-CV-8173, dkt. no. 378] at 8-9.)

3

On March 31, 2023, this Court issued an Opinion granting the Allen I Plaintiffs' motion to certify a class to pursue injunctive relief but denying the Plaintiffs' motion to certify a class to pursue damages. See Allen I, 2023 WL 2731733, at *6. The Court held that plaintiffs in Allen I had failed to show that the proposed "liability class" had standing to sue under Article III of the United States Constitution. See id. at *2-3.

Also on March 31, 2023, the Court granted the Allen I plaintiffs' motion for a preliminary injunction, determining plaintiffs had demonstrated ongoing constitutional violations, including medically unjustified discontinuations of MWAP treatment and a likelihood of imminent future harm across the class. Allen I, No. 19-CV-8173, 2023 WL 2752375, at *22-23 (S.D.N.Y. Mar. 31, 2023).

After a four-day bench trial, this Court converted the preliminary injunction into a permanent injunction, concluding that remedying the constitutional violations in DOCCS' pain management practices outweighed the administrative challenges DOCCS would face in implementing a permanent injunction. Allen I, 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023). The Court then awarded attorneys' fees to Plaintiffs' counsel. (Allen I, Order, dated February 22, 2024 [19-CV-8173, dkt. no. 850] at 1.)

The Court of Appeals affirmed this Court's decision to grant a permanent injunction and award Plaintiffs' counsel attorneys'

fees. Daniels et al. v. Moores, No. 24-30-pr, 2025 WL 883035, at *1 (2d Cir. Mar. 21, 2025) (summary order).  The Court of Appeals credited the Court's determination that "the MWAP Policy was still de facto in place, despite being formally rescinded, because prisoners in DOCCS custody continued to have their MWAP medications systematically denied without medical justification and without regard to medical need."  (Id. at *2.)  In addition, the Court of Appeals found no error in the Court's conclusion that Plaintiffs suffered Eighth Amendment violations and therefore irreparable harm.  (Id. at *2-3.)  In so holding, the Court of Appeals reiterated that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians" and where defendants "reflexively rel[ied] on . . . the substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe [the medication] to the plaintiff."  (Id. at *3 (citing Johnson v. Wright, 412 F.3d 398, 404, 406 (2d Cir. 2005).)

Following this Court's denial of certification of a "liability class," various plaintiffs filed individual suits for damages against various DOCCS employees, including RMDs, physicians, and nurse practitioners ("NPs").  (See, e.g., Amended Complaint as Severed from Allen I, filed June 30, 2023 ("AC: Daniels") [23-CV-5654, dkt. no. 1] at 3-5.)  Similar to the

5

allegations made in the class action, these plaintiffs each alleged violations of 42 U.S.C. § 1983 based on deliberate indifference to their medical needs.  (See, e.g., id. ¶¶ 349-72.)

## II.  Legal Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'It is the movant's burden to show that no genuine factual dispute exists.'"  I.M. v. United States, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'"  Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y., 746 F.3d 538, 544 (2d Cir. 2014) (quoting Liberty Lobby, Inc., 477 U.S. at 248).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196,

215 (S.D.N.Y. 2022) (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)).  In ruling on a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'"  Kayo v. Mertz, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'"  In re AXA, 595 F. Supp. 3d. at 215 (quoting Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)).  The non-moving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'"  Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

7

## III. <u>Applicable Law</u>

### A. Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits government officials from inflicting "cruel and unusual punishments" on those in their care.  U.S. Const. amend. VIII. Pursuant to the right to be free from cruel and unusual punishments, the Eighth Amendment prohibits prisons officials from acting with "deliberate indifference to serious medical needs of prisoners[.]" <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).

A prison official can be held liable for deliberate indifference in violation of the Eighth Amendment "only when two requirements are met." <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations and citations omitted), <u>abrogated in part on other grounds by</u> <u>Kravitz v. Purcell</u>, 87 F.4th 111 (2d Cir. 2023).  The first requirement the plaintiff must meet "is objective:  the alleged deprivation of adequate medical care must be 'sufficiently serious.'" <u>Id.</u> (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)).  The second requirement "is subjective: the charged official must act with a sufficiently culpable state of mind." <u>Id.</u> at 280.  Put differently, a plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." <u>Brock v. Wright</u>, 315 F.3d 158, 162 (2d Cir. 2003) (citing <u>Estelle</u>, 429 U.S. at 104).

Satisfying the objective prong entails two inquires. First, the Court must assess "whether the prisoner was actually deprived of adequate medical care." Salahuddin, 467 F.3d at 279. The second part of the objective inquiry asks whether the deprivation or inadequacy of the plaintiff's medical care is "sufficiently serious." Id. at 280.

Determining if the deprivation of medical care is sufficiently serious is "necessarily contextual and fact-specific" which requires "tailor[ing] [it] to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (cleaned up) (internal quotations and citations omitted). This includes examining the plaintiff's claim differently depending on whether he alleges the prison officials completely "fail[ed] to provide any treatment for [his] medical condition" or alleges only that the medical treatment he received was inadequate. See Salahuddin, 467 F.3d at 280.

If the former, the Court must "examine whether the inmate's medical condition is sufficiently serious." Id. at 280 (emphasis added). Certain factors courts consider when evaluating the seriousness of a medical condition include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," or "the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698,

702 (2d Cir. 1998) (internal quotations and citations omitted). If, however, the plaintiff alleges only "inadequacy [] in the medical treatment [he was] given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. Instead of determining the seriousness of the plaintiff's underlying condition, the Court must focus its inquiry "on the challenged delay or interruption in treatment[.]" Id. (citing Smith, 316 F.3d at 185). Such inquiry requires the Court to examine "the particular risk of harm" the plaintiff faced as a result of the deprivation, "rather than the severity of the [plaintiff's] underlying medical condition[.]" Smith, 316 F.3d at 186.

Accordingly, the Court inquires how serious the plaintiff's underlying medical condition is if he alleges he was entirely denied care, whereas it must assess the "particular risks attributable" to a provision of allegedly insufficient care or the "severity of [a] temporary deprivation" in care if that is the deprivation the plaintiff alleges. Id. at 186-87 (emphasis added).

To satisfy the subjective prong, i.e., to prove a prison official was deliberately indifferent to his or her medical needs, a plaintiff must "show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" Brock, 315 F.3d at 164 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This standard is akin to a mental state of subjective

10

recklessness, as used in criminal law. See Salahuddin, 467 F.3d at 280. The plaintiff may demonstrate the defendant's knowledge either by proving the official had actual knowledge of the risks to the plaintiff's health or by proving "that the risk was obvious or otherwise must have been known to [the] defendant[.]" Brock, 315 F.3d at 164.

## B. Personal Involvement

Plaintiff asserts his Eighth Amendment claims pursuant to 42 U.S.C. § 1983. To prevail on a § 1983 claim for a constitutional violation, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). Thus, to establish a particular defendant's liability, a plaintiff must "establish that [the particular defendant] violated the Eighth Amendment by [his or her] own conduct, not by reason of [his or her] supervision of others who committed the violation" and that each particular defendant "knew of and disregarded an excessive risk to [Plaintiffs'] health or safety." Id. at 619 (citing Vega v. Semple, 963 F.3d 259, 273 (2d Cir. 2020)).

Such personal involvement requires "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional

11

practices occurred[.]" Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

### C. Qualified Immunity

The Supreme Court has held that "[g]overnment officials are entitled to qualified immunity [from liability] with respect to 'discretionary functions' performed in their official capacities." Ziglar v. Abbasi, 582 U.S. 120, 150 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Whether a government official can invoke qualified immunity "turns on the 'objective legal reasonableness' of the official's acts." Id. at 151 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The reasonableness of the official's actions "must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" Id. (quoting Creighton, 483 U.S. at 639).

To determine whether the official violated rights that were "clearly established," the Court "must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." Id. at 151-52 (internal quotations and citations omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." Id. at 152. As the Supreme Court phrased differently in a previous case, the "right must be sufficiently clear that every reasonable official would

12

have understood that what he [was] doing violate[d] that right." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (internal quotations and citations omitted).

When confronted with the qualified immunity defense, the Court must determine the scope of the right that the plaintiff asserts was clearly established and that the official violated. There need not exist "a case directly on point" that addresses facts perfectly analogous to the instant case before the Court, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (internal quotations and citations omitted). In other words, "the precise conduct at issue need not previously have been ruled unlawful" for the Court to conclude that the right was clearly established. Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (citing Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)). As the Court of Appeals has noted in the specific context of claims of deliberate indifference in violation of the Eighth Amendment, assertions of qualified immunity "are not analyzed body-part by body-part" or with "specificity as to the site and cause of pain[.]" Collymore v. Myers, 74 F.4th 22, 30 (2d Cir. 2023). Such a "restricted view of the right" alleged to have been violated would be unnecessarily narrow in determining whether the right was clearly established at the time of its alleged violation. See LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir. 1998).

13

On the other hand, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established." <u>Vega</u>, 963 F.3d at 275 (emphasis in original) (internal quotations and citations omitted). Accordingly, the Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." <u>Id.</u> In the context of claims for deliberate indifference, this means "'sufficiently serious' medical conditions 'should not be defined at a high level of generality.'" <u>Collymore</u>, 74 F.4th at 30 (quoting <u>White v. Pauly</u>, 580 U.S. 73, 79 (2017)).

## IV. <u>Discussion</u>

Mr. Rosado has a history of radiculopathy and neuropathic pain. (Agnew Decl. Ex. 22-1 [23-cv-3718, dkt. no. 201-22] at *21, 28, 29, 30, 33, 40; Ex. 22-2 [23-cv-3718, dkt. no. 201-23] at *53, 54, 55, 58, 60, 67.) Mr. Rosado had two back surgeries in June of 2019, while in DOCCS custody. (Rosado Tr. [23-cv-3718, dkt. no. 171-2] at 39:25-40:6.)

In August 2019, Mr. Rosado was transferred to Shawangunk Correctional Facility ("SCF"). (Statement of Undisputed Facts ("SUF") [23-cv-3718, dkt. no. 169] ¶ 1; Agnew Decl. Ex. 24-15 [23-cv-3718, dkt. no. 201-51] at *246.) Upon arrival, Dr. Lee was Mr. Rosado's primary care provider until at least November 2019. (SUF ¶ 1.) There is some disagreement between parties on the length

14

and extent of treatment by Dr. Lee after November 2019.    (SUF (Response) ¶ 1; Reply at 3.)    Dr. Lee retired in November of 2019, but returned to his position a month later on a per diem basis. (SUF ¶¶ 22, 23.)

Plaintiff highlights Dr. Lee's continued participation in Mr. Rosado's treatment, as evidenced by his initials on many of Plaintiff's medical records between January 2020 and August 2020. (See Agnew Decl. Ex. 25-2 [23-cv-3718, dkt. no. 201-56] at *12, 15, 17, 19; Ex. 25-5 [23-cv-3718, dkt. no. 201-59] at *47, 49, 52; Ex. 25-6 [23-cv-3718, dkt. no. 201-60] at *55, 58; Ex. 25-8 [23-cv-3718, dkt. no. 201-62] at *85, 87; Ex. 25-9 [23-cv-3718, dkt. no. 201-63] at *89, 92, 94; Ex. 25-14 [23-cv-3718, dkt. no. 201-68] at *148.)

On August 15, 2019, Mr. Rosado wrote in a sick call slip that the "nerve damage medication [was] not work[ing] for [him.]" (Agnew Decl. Ex. 24-15 at *256.)    Subsequently, from August 18-22, he refused to take Trileptal, his prescribed pain medication, repeatedly explaining it did not work on his nerve damage.    (Agnew Decl. Ex. 24-16 [23-cv-3718, dkt. no. 201-52] at *258-63; SUF ¶ 4.) These refusals were initialed by Dr. Lee.    (Agnew Decl. Ex. 24-16 at *258-63.)

Dr. Lee first saw Mr. Rosado on September 3, 2019, where he noted his prior laminectomy but did not make any changes in his prescriptions.    (Id. at *266-67.)    Dr. Lee stated that because Mr.

15

Rosado resumed taking his Trileptal on August 29, he "saw no reason to discontinue this medication as it appeared [Mr. Rosado's] pain was being managed and he was scheduled to see a neurologist in the near future." (Lee Decl. [23-cv-3718, dkt. no. 170] ¶ 17.) On September 11, 2019, Mr. Rosado submitted another sick call form stating, "Meds don't work for my nerve damage." (Agnew Decl. Ex. 24-16 at *272.)

Mr. Rosado also testified that at some point during treatment, he told Dr. Lee the medications he prescribed "[weren't] helping at all[,]" and he requested "Gabapentin [and] Neurontin[,]" but Dr. Lee would not prescribe it. (Rosado Tr. Cont. [23-cv-3718, dkt. no. 202-1] at 204:7-24.)

On September 12, 2019, Mr. Rosado saw a neurosurgeon, Dr. Adamo, for an appointment following his lumber fusion that past June. (SUF ¶ 10.) Dr. Adamo recommended Gabapentin 300mg three times per day for Mr. Rosado's continuing neuropathic pain and physical therapy. (Agnew Decl. Ex. 24-16 at *276; SUF ¶ 11.) On September 16, 2019, Defendant Lee initialed the recommendation and made a note in Mr. Rosado's medical records, but he did not submit an MWAP request the Neurontin prescription and provided no explanation as to why. (Agnew Decl. Ex. 24-16 at *273; 276.)

The DOCCS policy at the time said, "PCP will initial and date the consult, document the consultant's recommendations in the Ambulatory Health Records (AHR), Dental Record or progress notes.

16

Though the PCP may choose to follow, modify or decline to follow the consultant's recommendations, any action/inaction taken on such recommendations must be documented in the AHR." (See Agnew Decl. Ex. 1 [23-cv-3718, dkt. no. 201-1] at *501.)

On October 1, 2019, Dr. Lee saw the patient again. (SUF ¶ 13.) He noted numbness spreading down patient's right lower leg. (Agnew Decl. Ex. 24-16 at *280.) At this time, Dr. Lee discontinued Trileptal, ordered physical therapy, permitted Mr. Rosado to have meals in his cell, restricted his physical activity, and ordered Cymbalta 30mg once per day. (See id.; Lee Decl. ¶ 19.) Mr. Lee believed this to be a "reasonable and prudent course of treatment[.]" (Lee Decl. ¶ 19.)

There is conflicting evidence in Mr. Rosado's medical records as to the effectiveness of Cymbalta. (Agnew Decl. Ex. 22-1 at *30 (10/10/17: "[delta] to Cymbalta" and "weaned from Neurontin medical [delta] initially took edge off but less effective), 32 (10/23/17 "I just work up [] the pain"), 33 ("with relief for [lower back]", 35 ("taking Cymbalta for [pain]" and "Cymbalta working well") 37 (Cymbalta discontinued)).

Mr. Rosado began physical therapy in January 2020 but continued to suffer from ongoing spasms and severe pain. (Agnew Decl. Ex. 25-2 at *12, 17; Ex. 25-5 at *52; Ex. 25-6 at*55, 58; Ex. 25-8 at *87; Ex. 25-9 at *89, 94; Ex. 25-14 at *148.) Dr. Lee initialed all these documents. (Id.)

17

In August 2020, Mr. Rosado suffered a fall and because of his persistent pain was again referred to neurosurgery. (Agnew Decl. Ex. 25-10 [23-cv-3718, dkt. no. 201-64] at *103; Ex. 25-14 at *143, 151-152.) Another neurosurgeon, Dr. Dirisio, recommended Mr. Rosado be prescribed 300mg of Neurontin daily, increasing to three times a day. (Agnew Decl. Ex. 25-16 [23-cv-3718, dkt. no. 201-70] at *169, 170; SUF ¶ 31.) Aligned with this recommendation, a different doctor eventually requested the prescription, and it was approved on October 23, 2020. (Agnew Decl. Ex. 25-18 [23-cv-3718, dkt. no. 201-72] at *198; Ex. 25-19 [23-cv-3718, dkt. no. 201-71] at *199 (approving "Per neurosurgeon's recommendations.").)

There is also evidence that Mr. Rosado was in significant pain from his radiculopathy, that he had neuropathic pain, and that Dr. Lee was aware of this. Mr. Rosado had two back surgeries the same year prior to his arrival at SCF. (Rosado Tr. at 39:8-40:6.) His medical records frequently note his neuropathy and his ongoing pain in his statements to medical personnel. (Agnew Decl. Ex. 25-2 at *12, 17; Ex. 25-5 at *52; Ex. 25-6 at *55, 58; Ex. 25-8 at *87; Ex. 25-9 at *89, 94; Ex. 25-14 at *148.) Thus, a reasonable jury could conclude that Mr. Rosado suffered from a sufficiently serious condition.

Moreover, there is evidence that Dr. Lee did not follow the neurologist's recommendation of Neurontin 300mg TID and failed to explain this decision. (Agnew Decl. Ex. 24-16 at *273.) As a

18

result, Mr. Rosado did not have access to this medication until over a year later when he was issued the same recommendation by a separate neurosurgeon. (Agnew Decl. Ex. 25-18 at \*198; Ex. 25-19 at \*199.) This course of action was seemingly contrary to DOCCS policy at that time which gave the primary care physician discretion "to follow, modify or decline to follow the consultant's recommendations, [but] any action/inaction taken on such recommendations *must* be documented in the AHR." (Agnew Decl. Ex. 1 at \*501) (emphasis added).) And, although Dr. Lee placed Mr. Rosado on Cymbalta, assigned physical therapy, and made other changes to Mr. Rosado's restrictions (Lee Decl. ¶ 19), "such alternative care may still have deprived Plaintiff of adequate care by creating 'particular risks' that he would suffer 'chronic and substantial pain' without the requested medication." Daniels, 2025 WL 949842, at \*21 (citations omitted).

In addition, there is evidence that Dr. Lee was aware of the ineffectiveness of the medical treatment. Dr. Lee initialed Mr. Rosado's many refusal slips and his sick call slip where he explained the Trileptal was not working on his nerve pain. (Agnew Decl. Ex. 24-16 at \*256, 258-63.) Dr. Lee similarly initialed almost all the notes in his physical therapy records where Mr. Rosado complained on ongoing pain. (Agnew Decl. Ex. 25-2 at \*12, 17; Ex. 25-5 at \*52; Ex. 25-6 at \*55, 58; Ex. 25-8 at \*87; Ex. 25-9 at \*89, 94; Ex. 25-14 at \*148.) Based on the record, a reasonable

19

jury could find Dr. Lee was aware of a substantial risk that Mr. Rosado would suffer serious harm. And, moreover, the Court concludes that on this record, a reasonable jury could find that Dr. Lee acted with deliberate indifference.

Finally, as to qualified immunity, the Court adopts its previous holding in that "inmates have an Eighth Amendment right not to have prison officials rely on a policy to reject a request for a medication when the officials know it might be medically appropriate to prescribe the medication instead." Daniels, 2025 WL 949842, at *26. And, because there are disputed facts on the basis of reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity. See Daniels, 2025 WL 949842, at *27; see also Husain v. Springer, 494 F.3d 108, 133 (2d Cir. 2007) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

Accordingly, Dr. Lee's motion for summary judgment in 23-cv-3718 is DENIED.

## V.    Conclusion

For the seasons set out above Dr. Lee's motion for summary judgment is DENIED. Counsel shall confer and inform the Court by letter no later than April 14, 2026, how they propose to proceed. The Clerk of Court shall close docket number 168.

20

**SO ORDERED.**

Dated:     March 31, 2026
             New York, New York

LORETTA A. PRESKA
Senior United States District Judge

21